**IN THE COURT OF APPEALS OF IOWA**

No. 16-1482
Filed September 27, 2017

**IN RE THE MARRIAGE OF GEORGE E. HANNA
AND BETH A. HANNA**

**Upon the Petition of
GEORGE E. HANNA,**
        Petitioner-Appellant,

**And Concerning
BETH A. HANNA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Johnson County, Carl D. Baker,

Judge.


        George Hanna appeals from the economic provisions of the decree

dissolving his marriage to Beth Hanna.  **AFFIRMED.**


        Karen A. Volz of Ackley, Kopecky & Kingery, Cedar Rapids, for appellant.

        Daniel L. Bray and David M. Cox of Bray & Klockau, P.L.C., Iowa City, for

appellee.


        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, Presiding Judge.**

George Hanna appeals from the economic provisions of the decree dissolving his marriage to Beth Hanna. Because we find the valuation of the marital assets within the permissible range of the evidence, and the amount and duration of spousal support reasonable, we affirm.

## I. Background Facts and Proceedings

George and Beth's thirty-one-year marriage was dissolved by decree entered in June 2016.[1] The couple had two children, who are now both adults, with the youngest projected to have graduated from college in December 2016.

George began working as a dentist in 1982. He purchased the practice of an experienced dentist in Cedar Rapids and began splitting his time between the practice and teaching as an adjunct professor at the University of Iowa. In 1982, Beth received a nursing degree and worked at the University of Iowa Hospitals and Clinics. She received her master's degree in nursing in 1992. In 2000, the couple mutually decided Beth would leave her position and become a stay-at-home mother.

George incorporated his dental practice in the late 1990s, taking on an associate and constructing a new building for the practice. The couple enjoyed a comfortable marital lifestyle, including going on a couple of vacations per year, joining the local country club, saving for retirement, as well as making improvements to their home. For investment purposes, they purchased an interest in a Cedar Rapids restaurant and an interest in a Galena, Illinois, condo

---

[1] The decree was enlarged and amended on August 10, 2016. A September 1, 2016 order clarified that the August ruling, which decreased the spousal support, was prospective only.

with a friend. Further, they supported their children's college education and purchased a condo for them to occupy during their college years.

For retirement planning, George's dental office had a defined benefits pension plan, to which George contributed. The defined plan lost significant value during the economic downturn of 2008-2009. As a result, the IRS directed George to pay $212,000 to fully fund the plan. George borrowed money to fund the plan. George also borrowed money from the dental practice for family expenses, a debt he continues to repay each year. In January 2005, George's associate bought a one-half interest in the practice for $287,000. It was understood by George, Beth, and the associate that over time George would be bought out by the associate's wife, who was also a dentist, and George would stay on as an associate. At the time of trial, that had not occurred.

The marriage began to erode in 2009, and from 2010 to 2015, George's W-2 income decreased from $413,950 to $221,500; however, the associate testified George's production and gross revenues inexplicably remained as high in 2015 as they had been in 2011.

Beth returned to the workforce in 2010, performing administrative tasks for George's dental practice. After two years, she left the practice and at the time of the dissolution trial was employed by the University of Iowa. Beth earns a base salary of $91,762 and receives retirement contributions of $9176.

George filed for dissolution of marriage on December 10, 2014, with the matter coming on for trial on April 19–20, 2016. In its decree, the court noted both George and Beth are in excellent health and both have received advanced degrees. The court highlighted Beth's contributions to the marriage and

George's greater earning capacity. The court divided marital assets between George and Beth, and with the equalization payment taken into account, Beth received 49.5% of the assets, and George received 50.4%. Of Beth's approximate $67,000 of inherited funds, which she received during the marriage, $41,000 was set aside to her. Each was awarded various pension and retirement accounts, and each agreed to pay various debts. George was awarded his interest in the dental practice. The dental practice appraiser valued the practice before the 2005 sale to the associate and again prior to the dissolution. Both parties agreed the appraised value of the practice is $1,361,000, or $680,550 for George's one-half share. However, George disputes the value of the practice set by the district court, which included accounts receivable, a loan receivable from George's personal loan from the practice, and proceeds from the practice's loan to George's sister. George asserts his share should be assessed at $598,884,[2] and debt totaling $289,217 should be deducted from his share.

The court ordered George to make an equalization payment to Beth of $250,000, in four equal installments of $62,500. The court also ordered George to make spousal support payments of $3500 per month until Beth reaches sixty-five years of age and then $2000 per month thereafter. In determining spousal support, the court noted:

> As noted in the discussion of the division of property, this is a 31-year marriage. George and Beth are in excellent health. Both have received advanced degrees in dentistry and nursing

---

[2] George arrives at $598,884 by reducing the value by nine percent (three years of work (1982-1985) before marriage) to reflect the value during the marriage.

respectively. Beth gave up her employment in 2000 so she could be home with their children. George agreed with this decision.

George has a known earning capacity of $400,000 per year. Beth has a yearly salary of $91,762. In 2011, George earned $424,750 from his dental practice. In 2012, his income dropped to $254,750. Over his career, George has earned an average of $299,000 per year. The Court concludes that George can earn $300,000 per year or more.

The contributions to the marriage by Beth and George's greater earning capacity make this an appropriate case for traditional alimony, which will allow Beth to have a standard of living reasonably comparable to that enjoyed during the marriage.

On June 27, 2016, George filed a posttrial motion under Iowa Rule of Civil Procedure 1.904(2), disputing several aspects of the marital assets valuation by the court, as well as the spousal support. The court reduced George's spousal support payments to $3000 per month until Beth reaches age sixty-five, then $1500 per month until the death of either party or until Beth remarries. The court supported the reduction because Beth "was awarded cash and retirement assets from which she can withdraw income upon her retirement."

George appeals both the equalization payment stemming from the property valuations and the need for spousal support.

## II.     Scope and Standard of Review

We review dissolution of marriage cases de novo. *In re Marriage of Veit*, 797 N.W.2d 562, 564 (Iowa 2011). But we give weight to the district court's findings, especially with regard to credibility determinations. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). We afford the district court considerable latitude in its alimony determination pursuant to the statutorily enumerated factors and will disturb its finding only when the award is inequitable. *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005).

### III.    Analysis

### A.    Spousal Support

George contends the district court's spousal support award was unnecessary and it should be eliminated.  Iowa courts award spousal support as a stipend in lieu of a spouse's legal obligation for support.  *Hansen*, 733 N.W.2d at 702.  Whether spousal support is justified is dependent on the facts of each case.  *See In re Marriage of Fleener*, 247 N.W.2d 219, 220 (Iowa 1976).  Factors to be considered in awarding spousal support are set forth in Iowa Code section 598.21A(1)(a)-(j) (2014), which provides:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other factors the court may determine to be relevant in an individual case.

Spousal support can be traditional, rehabilitative, or reimbursement.  *See In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015).  The labels, however, may overlap in some cases*.  See In re Marriage of Gust*, 858

N.W.2d 402, 408 (Iowa 2015) (citing *In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008) (involving spousal support award the court could not characterize as strictly rehabilitative or traditional)). "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *See In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997).

Though Beth currently earns $91,762, she did not work for several years so she could be home with the children and help promote George's career. During this time, George grew his dental practice significantly, often working long hours. Although George testified his income had declined significantly in the past few years, his associate testified that from 2011 to 2015 there was no marked decline in George's production, and the associate did not notice George working fewer hours or taking fewer patients. Even though George reported less W-2 income than he did before, the district court found the evidence showed his average earning capacity—$300,000—is significantly higher than Beth's. The district court correctly found Beth would be able to support herself, however, not at the standard of living reasonably comparable to that enjoyed during the marriage. We agree. Beth's income, while substantial, is only one-third of George's, lowering the standard of living she enjoyed during this long marriage. We affirm the award of spousal support.

## B. Marital Property and Debts

George next contends the district court did not properly value the marital property and debts, resulting in an inequitable equalization payment. He asserts the correct equalization payment is $167,000—calculated primarily by reducing

the value of the dental practice—not the $250,000 the district court found.

A percentage division of assets is not mandated. *In re Marriage of Wiedemann*, 402 N.W.2d 744, 747 (Iowa 1987). The parties to a marriage are "entitled to a just and equitable share of property accumulated through their joint efforts." *In re Marriage of Havran*, 406 N.W.2d 450, 452 (Iowa Ct. App. 1987). We defer to the district court when its valuation of a particular asset is accompanied with supporting corroborative evidence or credibility findings. *See In re Marriage of Decker*, 666 N.W.2d 175, 180 (Iowa Ct. App. 2003).

### 1. Dental Practice Value

George presented evidence on the question of how much his dental practice was worth through the testimony of his expert, who had completed approximately 600 dental practice appraisals since 1992. The expert testified, as of December 2014, George's practice had a value of $1,361,100. The calculation did not include accounts receivable or debts owed to the practice because they "fluctuate daily." The expert estimated accounts receivable are roughly one month's production.

> The court addressed the expert's appraisal and restated his findings:

> The dental practice was valued by [the expert]. He concluded that the practice had a value of $1,361,000 in 2014. The valuation does not include accounts receivable. Beth contends that $150,000 in accounts receivable should be added to the value and that gross revenue in 2014 was almost $1,800,000. The valuation by [the expert] does not address how practice income is divided between [the associate] and George. Receivables vary from hour to hour and were not included in the evaluation. [The expert] did not consider debt in the valuation because it changes daily. Payback on loans does not increase the value of the practice. Cash on hand does not affect value.

On appeal, George challenges the district court's valuation of the practice and asserts $289,217 in dental practice debt should be deducted from the total value of the practice.[3] The court added one month of accounts receivable to the value and deducted debt related to equipment and consulting, finding the total value of George's one-half interest in the dental practice to be $764,226.12. The court, however, did not deduct what George claims is the *practice's* pension plan debt because the court considered it a reduction in the value of the pension fund.

Historically, the dental practice operated by allocating all income to either the pension plan or to employee salaries. George testified that shortly after purchasing the dental practice he was in contact with a dental consulting firm regarding setting up the corporation[4] and defined benefits plan. The consulting firm recommended he take from the practice income only what he needed to pay living expenses. The remaining income would be put towards the defined benefits plan. It appeared the practice was structured this way to avoid paying ordinary income tax on monies used to fund the defined benefits plan. Since the corporation was "zeroed" every year, paying either salary or contributing to the defined benefits plan, George, not the corporation, took out loans to fund the plan

---

[3] George's dental practice debt calculation consists of equipment, dental consultant debt, and debt related to loans taken to fund the defined benefit pension plan. We note George's proposed equalization payment accounts for equipment and consulting loans twice by removing equipment and consulting loans from the dental practice valuation, while simultaneously adding equipment and consulting loans to the total dental practice debt.

[4] The dental practice consisted of a corporation set up for George and a separate corporation for his associate. All expenses of the dental practice were paid prior to either person taking income from the practice.

after it lost significant value.[5]  Thus, George, not the corporation, was personally liable for the debt.

In addition, the expert testified that any accounts receivable, while not added to the appraised value of the practice, nonetheless have value.  That is, when a business is sold, while the accounts receivable are not included in the valuation, they still generally remain with the seller.  We agree.  Here, the district court calculated the corporation's value by adding a loan receivable from George's personal loan from the corporation, a loan to George's sister, and outstanding accounts receivable owed to the corporation.[6]  Considering the many variables and the record as a whole, we find the district court's valuation of the assets is within the permissible range of the evidence and affirm.  *See Hansen*, 733 N.W.2d at 703 ("Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence.").

### 2. Marital Property

George next asserts the court's equalization payment fails to take into account all of the marital debt he assumed.  The court allocated approximately $16,400[7] in debt to Beth and approximately $126,959.80 in debt to George.  George's argument continues to dispute how the district court valued the dental

---

[5] The court ruled on George's 1.904(2) motion and continued to characterize the pension fund debt as a reduction in value of the pension fund rather than a reduction in value of the practice, stating:

> The Defined Benefits Plan was correctly valued at $454,902, less the three loans taken out to fund the plan.  This is set forth in the summary sheets attached to Respondent's resistance to the motion to amend.  No further amendment or modification of the decree is required.

[6] The balance on the loan receivable on George's personal loan from the corporation was $42,549.00.

[7] Beth was ordered to pay a $15,000 loan that was incurred to pay 2014 taxes and ordered to pay $1400 to Honkamp Krueger & Co., P.C.

practice and the associated debts. Having affirmed the district court's valuation, George's remaining debt argument consists of the two auto loans assigned to him. The 2012 Kia was initially and incorrectly valued at $10,670, but no value was given for its debt; in addition, no consideration was given to the debt associated with a 2013 Audi. This resulted in George being assessed with $31,495 in car loans with no credit toward the equalization payment.

The court ruled on George's 1.904(2) motion, stating:

> a. 2012 Kia Sedona debt.
> This vehicle was awarded to the Petitioner and given a value of $10,670. The parties agree that the value of $10,670 is misstated. Both parties agree the net value of the vehicle is $1670. Accordingly, the decree is amended to fix the net value of the 2012 Kia Sedona at $1670.
>
> b. 2013 Audi debt.
> This vehicle was awarded to the parties' son. . . . Petitioner was ordered to pay the debt on the vehicle in the amount of $20,825. The decree is amended to fix the market value of the Audi at $18,849.

George was awarded the car he drove, the 2012 Kia Sedona. The court initially stated only the value of the vehicle, without an offset for the debt; however, the court amended its finding and reduced the value to $1670. The court ordered George to continue paying the loan attached to the 2013 Audi because George had purchased the Audi in 2013 for his son, and therefore, he should pay the debt owed on the vehicle. George asserts he should have been given a credit for the car loans totaling $31,495 to offset some of the equalization payment.[8]

---

[8] George asserts the loan remaining on the Kia totals $10,260, and the loan remaining on the Audi totals $20,825.

Beth asserts the district court awarded the correct equalization payment because George was awarded more than fifty percent of the marital assets, the court valued George's business correctly, and did not include the pension debt in the business. George's net distribution was $1,113,364.18, while Beth's net distribution was $599,511.65. With George ordered to pay Beth $250,000 in a structured equalization payment, George's final distribution became $863,364.18 and Beth's was $849,511.65. As with the valuation of the assets, even considering the debt on George's vehicle, we find the district court's equalization award to be equitable and consistent with the evidence presented, and we affirm.

## IV.    Appellate Attorney Fees

Awards of appellate attorney fees are discretionary. *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996). We consider the needs of the party asking for fees, as well as the other party's ability to pay when determining whether fees should be awarded. Beth submitted an attorney fee affidavit requesting approximately $10,550 in appellate attorney fees. While Beth was successful in defending the district court's decree, we find she has assets and spousal support which allow her to be responsible for her own attorney fees and deny her request. Costs on appeal are assessed to George.

**AFFIRMED.**