# IN THE SUPREME COURT OF IOWA

No. 08–0948

Filed December 18, 2009

**IN RE THE MARRIAGE OF DAVID A. BROWN and PAMELA S. BROWN,**

Upon the Petition of
**DAVID A. BROWN,**

Appellant,

And Concerning
**PAMELA S. BROWN,**

Appellee.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Mary Jane Sokolovske, Judge.

Petitioner seeks further review of the court of appeals opinion affirming the district court's order dividing the petitioner's pension using the service-factor-percentage method. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

R. Scott Rhinehart of Rhinehart Law, P.C., Sioux City, for appellant.

Francis L. Goodwin of Baron, Sar, Goodwin, Gill & Lohr, Sioux City, for appellee.

**BAKER, Justice.**

Petitioner seeks further review of the court of appeals opinion affirming the district court's order dividing the petitioner's pension using the service-factor-percentage method. We are asked to determine: (1) whether the court of appeals erred in finding the dissolution decree was not final until the qualified domestic relations order ("QDRO") was entered and (2) whether the district court judge erred by adopting a QDRO that is alleged to be contrary to the specific language contained in the parties' decree of dissolution. We find the court of appeals erred in determining the dissolution decree was not final until the QDRO was entered; however, its adoption of a QDRO employing the service-factor-percentage method was not contrary to the language of the dissolution decree and will be upheld.

### I.      Background Facts and Proceedings.

David Brown and Pamela Brown were divorced on June 30, 1999. At the time of the dissolution, David worked for the City of Sioux City as a manager in the Inspection Services Department. Through his employment, David has an IPERS pension plan. The dissolution decree approximated the value of David's plan at $22,500.00 and awarded David sixty percent of the plan and Pamela forty percent of the plan. It then instructed the parties to submit a QDRO to the court for its approval.

A proposed QDRO was not submitted until March 2007 when both Pamela and David filed applications for entry of a QDRO. David filed a resistance to Pamela's proposed QDRO. He claimed Pamela's proposed QDRO uses the service-factor-percentage method to calculate her portion and incorrectly awards her forty percent of the gross monthly or lump sum benefit at the date of distribution. David also stated he had

prepared a proposed QDRO in 2004, which was approved by IPERS. This QDRO directs IPERS to pay Pamela $9,000 or forty percent of the total amount in David's IPERS account on the day of dissolution plus any accumulated interest on that amount.

After holding a hearing on the matter, the district court issued an order finding that *In re Marriage of Benson*, 545 N.W.2d 252 (Iowa 1996), was controlling, the service-factor-percentage method should be used to divide David's pension, and therefore, Pamela's proposed QDRO should be adopted. Pamela filed a rule 1.904(2) motion requesting the court correct and enlarge its order. Pamela specifically asked the court to insert provisions for the payment of interest on both her preretirement and postretirement death benefits. She also requested the court insert language that prevents David from taking a lump-sum distribution of his retirement benefits in order to deny Pamela her share of the pension. David filed a resistance to Pamela's motion. The court granted Pamela's motion and inserted her proposed language into the approved QDRO.

David subsequently filed a motion to amend, enlarge and clarify the district court's orders adopting Pamela's proposed QDRO and granting Pamela's rule 1.904(2) motion. In this motion David requested the court hold a hearing to determine: (1) whether the court should sign a QDRO that applies the service-factor-percentage method and (2) whether the approved QDRO should provide for interest on both the preretirement benefits and postretirement death benefits and prohibit David from taking a lump-sum distribution. Pamela filed a resistance to David's motion asserting that the service-factor-percentage method was appropriate. The court overruled David's motion.

David appealed the district court's ruling adopting Pamela's proposed QDRO. This appeal was transferred to the court of appeals.

The court of appeals affirmed the district court's order dividing David's pension according to the service-factor-percentage method. David filed an application for further review.

## II.    Standard of Review.

We review dissolution cases de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). " 'Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses.' " *Id.* (quoting *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003)). "Precedent is of little value as our determination must depend on the facts of the particular case." *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995).

## III.    Discussion and Analysis.

In this case, we are asked two questions: (1) whether the court of appeals erred in finding the dissolution decree was not final until the QDRO was entered and (2) whether the district court judge erred by adopting a QDRO that is contrary to the specific language contained in the parties' decree of dissolution.

**A.    Finality of Dissolution Decree.** In upholding the district court's QDRO utilizing the service-factor-percentage method, the court of appeals found the parties' decree unresolved at the time the district court received the parties' proposed QDROs in 2007 because QDROs were never submitted to the decretal court for approval in 1999. Despite not having been raised by either party, the court of appeals found the entire decree was not final, including the division of the pension, and was still subject to change in this appeal. Unlike in *Sullins* and *Benson*, the leading cases in this area of law, this is not a direct appeal of the dissolution decree. Neither of the parties appealed the court's division of

their marital property in 1999. It is well established that the divorce decree was therefore final and settled all rights and interests of the parties in the property of one another. *Carr v. Carr*, 185 Iowa 1205, 1211, 171 N.W.2d 785, 787 (1919); *see also Franklin v. Bonner*, 201 Iowa 516, 519, 207 N.W. 778, 780 (1926) ("There can be no question that a decree rendered in a divorce case is a finality as to all matters which were at issue, or which it was the duty of either party to present before the case went to final decree.").

According to Iowa Code section 598.21(7), property divisions made in a divorce decree are not subject to modification. Iowa Code § 598.21(7) (2007) ("Property divisions made under this chapter are not subject to modification."). The dissolution court's property division can only be challenged on direct appeal, *In re Marriage of Johnson*, 299 N.W.2d 466, 467–68 (Iowa 1980); thereafter property rights are afforded some sense of permanency and are not subject to modification by the court absent fraud, duress, coercion, mistake or some other grounds that would justify changing the decree. *In re Marriage of Knott*, 331 N.W.2d 135, 136–37 (Iowa 1983). There is no indication of fraud, duress, coercion or mistake in this case. As a general rule, "the property division in a marriage dissolution decree is self-executing with respect to the creation of new title or ownership interests." *Sieren v. Bauman*, 436 N.W.2d 43, 45 (Iowa 1989). All property awarded the parties in a dissolution becomes theirs the moment the decree is final. *Id.*

This principle is not entirely true as applied to pension divisions. Because of certain anti-alienation restrictions in the Employee Retirement Income Security Act (ERISA) and the federal tax code, a QDRO must be filed for every pension division undertaken pursuant to a divorce. *See generally Rohrbeck v. Rohrbeck*, 566 A.2d 767, 768–71 (Md.

1989). In Iowa, this QDRO must comply with Internal Revenue Code section 414(*p*) and Iowa Code section 97B.39, as well as the Iowa administrative rules. *See* 26 U.S.C. § 414(*p*) (2006), Iowa Code § 97B.39, Iowa Admin. Code r. 495–16.2. We have never decided whether a QDRO is a necessary part of the judgment of dissolution or if it should be regarded as supplemental to the divorce proceeding. The Iowa court of appeals, however, has stated:

> [W]e believe the issuance of a QDRO following a final decree for dissolution of marriage does not constitute an unlawful modification of property awarded under the original decree.
>
> . . . .
>
> ERISA does not require a QDRO to be part of the actual judgment in a case. It does, however, define several requirements which must be met before an order will be considered to be a QDRO.

*In re Marriage of Bruns*, 535 N.W.2d 157, 161–62 (Iowa Ct. App. 1995) (citations omitted).

In *Rohrbeck*, the Maryland Court of Appeals further explained how a QDRO affects the finality of a divorce decree. *Rohrbeck*, 566 A.2d at 774–75. The *Rohrbeck* court distinguished between QDROs that aid in the enforcement of previously entered final orders and QDROs that are required to be prepared and submitted as part of the court's final judgment. *Id.* The court stated:

> To be final and conclusive . . . [a] ruling must necessarily be unqualified and complete, except as to something that would be regarded as collateral to the proceeding. It must leave nothing more to be done in order to effectuate the court's disposition of the matter. In the first instance, that becomes a question of the court's intention: did the court intend its ruling to be the final, conclusive, ultimate disposition of the matter?

*Id.* at 774. Ultimately, the *Rohrbeck* court decided the district court had made it clear that the ruling it entered would not be final and complete until the QDROs were submitted and signed. *Id.* The court further explained that the QDROs submitted to the district court in that case were not merely perfunctory in nature, but were intended to resolve significant disagreements between the parties, such as whether the ex-spouse would receive survivor benefits. *Id.* at 775 n.6.

The *Rohrbeck* court recognized that there may be situations in which a QDRO is intended to be collateral to the judgment.

> [W]here a QDRO is needed to enforce an earlier entered support order, it obviously cannot be part of the underlying judgment. Even when the QDRO is required to effectuate a disposition . . . there may be circumstances where the need for the order may not be apparent at the time the judgment is entered or where an order entered as part of a judgment has to be modified later because some deficiency in it precludes it from being accepted as a QDRO. We therefore expressly recognize the ability of a party otherwise entitled to a QDRO to obtain one as an aid to enforcing a previously entered judgment.

*Id.* at 774.

The Browns' divorce decree states "A separate Qualified Domestic Relations Order should be entered in such regard. The parties should submit such an order to the Court for its signature." Based upon the language of the dissolution court's decree and the overall property division, we determine this QDRO is supplemental and not a part of the underlying decree.

This finding is in line with our previous cases concerning supplemental orders to enforce property divisions. In *Welp*, we held that a supplemental order intended to enforce the court's earlier dissolution decree dividing the parties' property did not render the marriage dissolution unresolved. *In re Marriage of Welp*, 596 N.W.2d 569, 572–73

(Iowa 1999). In that case, we reiterated "that a 'final decree is the one in which the marriage is terminated. If review of the provisions of that decree is desired, appeal must be taken within 30 days of its entry.' " *Id.* at 572 (quoting *In re Fenchel*, 268 N.W.2d 207, 209 (Iowa 1978)). Accordingly, after the appeal period has passed, the parties may appeal the supplemental order, but they may not appeal provisions in the original decree. *Id.* at 573.

The Browns' divorce decree was final when entered. Any appeal to change the language of the district court's division of the pension plan was required to be filed in 1999, not 2008.[1]

**B. Pension Plans.** Pension plans are divisible marital property. *Sullins*, 715 N.W.2d at 247. There are two types of private pension plans: defined-benefit plans and defined-contribution plans. *Benson*, 545 N.W.2d at 254. Both types of plans may be funded through contributions made either solely by the employer (noncontributory plan), or contributions by both the employer and the employee (contributory plans). *Id.* IPERS is a defined-benefit plan. *Sullins*, 715 N.W.2d at 249; *see also* Iowa Code § 97B.49A(3) ("For each active or inactive vested member retiring on or after July 1, 1994, with four or more complete years of service, a monthly benefit shall be computed which is equal to one-twelfth of an amount equal to the applicable percentage of the three-year average covered wage multiplied by a fraction of years of service.").

---

[1]In January of 2004, David also filed a petition to modify the divorce decree to eliminate spousal support due to his remarriage, the death of the parties' youngest son, Pamela's full-time employment, and Pamela's long-term relationship with another individual. A trial was held on the matter. The district court overruled David's petition. David appealed and the court of appeals affirmed the judgment of the district court.

Both David and the State of Iowa contribute to his IPERS plan; therefore, it is a contributory defined-benefit plan. *Benson*, 545 N.W.2d at 254.

Under a defined-benefit plan, the future benefit received is determined in advance based on a benefit formula. *Id.* Such a plan "provides a benefit that is related to the employee's earnings and length of service." *Id.* at 254–55 (citing Steven R. Brown, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post-Judgment Partition Actions: Cures for the Inequities in Berry v. Berry*, 39 Baylor L. Rev. 1131, 1141–42 (1987)).

There are two acceptable methods for dividing pension benefits: the present-value method and the percentage method. *Sullins*, 715 N.W.2d at 248; *Benson*, 545 N.W.2d at 255. Under the first method, the court determines the current value of the plan and awards the spouse a share of the total. *Benson*, 545 N.W.2d at 255. Under the percentage method, the court awards the spouse a percentage of the pension that is payable when the benefits mature. *Id.*

Although both methods may be used to divide a defined-benefit plan, we have expressed a preference for the percentage method. *Sullins*, 715 N.W.2d at 248. The present-value method presents problems because it requires the court to determine the present value of the plan before it can allocate a portion to the spouse. *Id.* Determining the present value of a defined-benefit plan is complicated and requires actuarial science. *Id.* This is partially because the present value actually represents a series of payments computed into one lump sum payment in current dollars. *Id.; see also Thompson v. Thompson*, 438 A.2d 839, 841 (Conn. 1981) ("The present value of a pension benefit may be arrived at by using general[] actuarial principles to discount for mortality, interest and the probability of the employee remaining with the employer

until retirement age."). In expressing this preference, the court also considers the economic difficulty of paying a lump sum amount at the time of dissolution. *Sullins*, 715 N.W.2d at 249.

As previously noted, David's pension is a defined-benefit plan with its attendant problems in accurately determining its present value. Therefore, it was preferable that the percentage method be used to divide the benefits.

**C. The QDRO.** David contends the district court erred by adopting a QDRO that is contrary to the language of the parties' decree of dissolution. He claims the language of the parties' 1999 dissolution decree employed the present-value method. The problem is no one appealed the decree in 1999. We are now at the QDRO stage and must determine the effect of the language in the decree. After reviewing both parties' proposed QDROs, the district court applied the percentage method to divide David's pension, and therefore, adopted Pamela's proposed QDRO.

A dissolution decree is construed like any other written instrument. *In re Marriage of Lawson*, 409 N.W.2d 181, 182 (Iowa 1987).

> "The decree should be construed in accordance with its evident intention. Indeed the determinative factor is the intention of the court as gathered from all parts of the decree. Effect is to be given to that which is clearly implied as well as to that which is expressed. Of course, in determining this intent, we take the decree by its four corners and try to ascertain from it the intent as disclosed by the various provisions of the decree."

*In re Marriage of Goodman*, 690 N.W.2d 279, 283 (Iowa 2004) (quoting *In re Roberts' Estate*, 257 Iowa 1, 6, 131 N.W.2d 458, 461 (1964)). In construing a dissolution decree, we give force and effect to every word, if possible, in order to give the decree a consistent, effective and reasonable meaning in its entirety. *Lawson*, 409 N.W.2d at 182–83.

David's pension plan is divided in the dissolution decree as follows:

> David has an IPERS pension plan which is currently valued at *approximately* $22,500.00. This plan should be divided so that David receives 60% of it and Pamela receives 40% of it. This is to account [for] the disparity in value of the property previously awarded the parties. A separate Qualified Domestic Relations Order should be entered in such regard. The parties should submit such an order to the Court for its signature.

(Emphasis added.)

David claims that according to this language, the estimated value of the pension on the date of dissolution was to be divided using the percentages provided by the court. He was to receive $13,500 and Pamela was to receive $9,000 of the pension plus ten percent interest on her portion compounded annually. He claims this would make her portion of the pension plan worth approximately $17,540 today. Pamela disputes this interpretation and asserts that the percentage method was intended.[2]

To determine whether the district court intended the division of David's pension to be under the present-value method or the percentage method, we must interpret the language of the district court's division. Although the decree purports to value the plan, the record does not contain any actuarial data submitted by either of the parties; thus, we can only conclude the district court based its figure on the statement

---

[2]Pamela's proposed QDRO states the service-factor formula should be used to determine the respondent's benefits according to the following formula:

> 40% of the gross monthly or lump sum benefit payable at the date of distribution to the Member multiplied by the "service factor." The numerator of the service factor is the number of quarters covered during the marriage period of October 7, 1972 through June 30, 1999 and the denominator is the Member's total quarters of service covered by IPERS and used in calculating the Member's benefit.

that showed the value of David's contributions to the plan up until the date of dissolution. This figure does not accurately value the present worth of the benefits. *See In re Marriage of Scheppele*, 524 N.W.2d 678, 679 (Iowa Ct. App. 1994) (noting the value of petitioners IPERS pension is not limited to her vested contributions). As we noted in *Sullins*, the amount of a participant's IPERS contributions has no relation to the present value of the future benefits because the contributions are not used to calculate benefits. *Sullins*, 715 N.W.2d at 249. Instead, the benefits are ultimately tied to a percentage of the employee's average wages. *Id.*

Absent detailed expert testimony involving mortality and discount rates, future contributions and other factors, an accurate present-value calculation was impossible. *Id.* at 248–49. Thus, without such evidence, the percentage method would have been the only practical way to equitably divide David's pension. *In re Marriage of Branstetter*, 508 N.W.2d 638, 642 (Iowa 1993). We find the language used by the district court to divide David's pension was intended to divide it according to the percentage method.

In interpreting divorce decrees, we give effect not only to that which is plainly expressed, but also that which is implied. *Goodman*, 690 N.W.2d at 283. The court expressly stated David's pension was valued at approximately $22,500.00, but it also gave David and Pamela's portions of the pension in terms of percentages. While these statements appear contradictory, we must assume that the district court knew of the problem highlighted in *Scheppele*—that the amount of David's contributions was not an actual present-value calculation. We must also assume that the district court knew of *Benson* and *Branstetter*, citing the practical problems in trying to divide a defined-benefit plan using the

present-value method. We also believe that if the intent was to use the present-value method, a sum certain would have been found, not an approximation.

In its decree, the court also stated that its division of the pension was intended "to account [for] the disparity in value of the property previously awarded the parties." In construing a dissolution decree, we give force and effect to every word if possible. *Lawson*, 409 N.W.2d at 182–83. Rather than an extraneous detail, we believe the court's approximation of the present value of the pension plan was included as a way of explaining the equality of the property division as a whole.

In trying to give a consistent, effective, and reasonable meaning to the language used, we find that the intent of the court's language was to utilize the percentage method to divide the pension. We therefore find Pamela's proposed order comports with the intent of the original decree and affirm the district court's order.

**IV. Disposition.**

We hold that the decree entered in 1999 was final as to the property division and the division of the pension plan. We further find that the district court properly utilized the percentage method to divide the pension plan. The order of the district court is affirmed.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**